IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FINANCIAL SOFTWARE SYSTEMS, INC.,** *Plaintiff,* | : : : : | **CIVIL ACTION** |
| v. | : : | |
| **QUESTRADE, INC.,** *Defendant.* | : : : | **No. 18-742** |

## MEMORANDUM

PRATTER, J.                                                                                                                                                                       MAY 8, 2019

Eight years ago, Financial Software Systems, Inc. ("Financial") agreed to provide software services to Questrade, Inc. to support Questrade's trading platform. After Questrade refused to pay invoices, Financial brought an action for breach of contract and unjust enrichment. Both parties filed motions for summary judgment and argue that they are entitled to judgment in their favor.

Financial raises two theories of liability for its breach of contract claim: (1) as it did in its complaint and throughout the course of this litigation, Financial argues that Questrade failed to effectively terminate the parties' agreement and is liable for unpaid invoices totaling $167,724.85; and (2) relying on an alleged scrivener's error in the parties' agreement, Financial now argues—for the first time—that even if Questrade effectively terminated the agreement, Questrade could not do so without paying an early termination fee of $90,000.00. Financial also claims that even if Questrade effectively terminated the parties' agreement and could terminate the agreement early without a penalty, Questrade was unjustly enriched because Questrade had access to Financial's software post-termination.

1

Because Financial's original breach of contract theory turns on a disputed issue of material fact—whether Questrade effectively terminated the agreement—the Court will deny the competing motions for summary judgment as to this claim. However, Financial did not raise the scrivener's error theory until its motion for summary judgment—filed after the completion of discovery—and permitting Financial to now pursue this breach of contract theory would impermissibly prejudice Questrade. Therefore, the Court will preclude Financial from pursuing its scrivener's error theory of liability.

Finally, Financial's unjust enrichment claim is not foreclosed because, although the parties' relationship is the subject of a contract, the parties dispute whether the contract was terminated. However, because whether Questrade actually benefited from its post-termination access to Financial's software and whether "equity and good conscience" require restitution remain in dispute, the Court will deny the competing motions for summary judgment as to this claim as well.

## BACKGROUND

### I. The Negotiations

Questrade, an entity that provides online brokerage and stock trading services to investors in Canada, issued a request in early 2011 for proposals seeking software services to support its trading platform. *See* Exh. E to Questrade's Mot. Summ. J. at 8:14–19 (hereinafter "Ladwa Deposition"). Financial, a company that develops and licenses financial risk-management software, responded to Questrade's RFP. *See* Exh. 2 to Financial's Mot. Summ. J. Questrade decided to work with Financial, and the parties actively negotiated a contract governing their relationship (the "Agreement"), working from Questrade's template agreement forms. *See* Ladwa Deposition at 17:23–19:10.

During negotiations, Questrade shared with Financial a concern about being bound to an agreement for an extended duration. *See id.* at 60:23–61:61. In August 2011—following a conference call between the parties—Financial circulated a draft Master Services Agreement containing an early termination clause. *See* Exh. H to Questrade's Mot. Summ. J. The draft early termination clause allowed Questrade to terminate the agreement early, but, under certain circumstances, Questrade would have to pay an early termination fee. *Id.* In relevant part, the draft early termination clause provided:

> **(b) Early Termination**. Questrade acknowledges that the amount of the monthly recurring fee for the [Agreement] is based on Questrade's agreement to pay the agreed-upon fees associated with the ordered Services for the entire Initial Term. In the event Financial terminates the Agreement for Questrade's breach of the Agreement in accordance with Section 13 (Termination), or Questrade terminates the [Agreement] other than for Financial's breach in accordance with Section 13 (Termination), Questrade shall pay to Financial the fees described in the table below ("Termination Fees"):

| Period of Time In The Initial Term In Which The Agreement is Terminated | Monthly Fees Due From Questrade to FSS |
|---|---|
| 1st Month to the 18th Month | 12 |
| 19th Month to the 24th Month | 6 |
| 24th Month to the 33rd Month | 3 |

*Id.*

After receiving the draft Master Services Agreement from Financial, Praneil Ladwa, Questrade's then-Manager of Project Operations and Vendor Management, provided his colleagues with updates about the negotiations. *See* Exh. 5 to Financial's Mot. Summ. J. Although the draft early termination provision did not list an early termination fee for termination after the 33rd month, Mr. Ladwa informed his colleagues that, under the terms of the agreement, Questrade would be allowed to "walk away from contract after 33 months with a 3-month penalty ($90,000)."

3

*Id.* Mr. Ladwa repeated this statement in a second email to other Questrade employees. *See* Exh. 6 to Financial's Mot. Summ. J.[1]

## II. The Agreement

The parties executed the Agreement on August 9, 2011, giving Questrade a license to use Financial's software. *See* Exh. 7 to Financial's Mot. Summ. J. (hereinafter "the Agreement"). The five-year term of the Agreement extended from September 12, 2011 to September 11, 2016. *Id.* at § 2; *id* at Service Order Form § 6(a). Questrade agreed to make a series of payments for its use of Financial's "Spectrum Treasury System" and to pay a monthly hosting fee, which was to be billed on a quarterly basis. *Id.*

Section 13 of the Agreement identified four instances in which Questrade could terminate the Agreement without any liability, including if:

(1) Financial failed "in a material way to provide the Managed Hosting Service in accordance with the terms of the Agreement" and did not cure the failure within ten days of Questrade's written notice;

(2) Financial materially violated any other provision of the Agreement and did not cure the violation within thirty days of Questrade's written notice;

(3) Financial became bankrupt, insolvent, or was liquidated; or

(4) the Agreement was terminated within six months of its execution.

Section 4(b) of the Agreement contained the same early termination clause included in the draft agreement discussed above. The provision allowed Questrade to terminate the agreement

---

[1] In its opposition to Financial's motion for summary judgment, Questrade attached a declaration from Mr. Ladwa in which he states that "[w]hile attempting to quickly summarize what would happen if Questrade wanted to terminate the Agreement at the end of the third year, I mistakenly wrote that Questrade could walk away from the contract after 33 months with a 3-month penalty." Exhibit D to Questrade's Response to Financial's Mot. Summ. J. at ¶ 6. Mr. Ladwa apparently always understood that "Questrade would not be obligated to pay a termination fee if it terminated the Agreement after the thirty-third month." *Id.* at ¶ 10.

4

early, but, depending on how much time had passed, required Questrade to pay an early termination fee. Financial now claims—for the first time—that Section 4(b) contained an important error because it failed to reflect the parties' agreement that Questrade would remit a termination fee equivalent to three months of fees even if Questrade terminated the agreement *after* 33 months. Questrade denies that this was part of the parties' agreement.

Section 17 of the Agreement stated that Questrade was to provide notice to Financial under the Agreement by first class mail or "established and well-known express courier." Section 19(c) of the Agreement provided that it is governed by New York law. And Section 19(d) provided that, except for specific circumstances not at issue here, the Agreement could only be amended by a formal written agreement signed by both parties.

### III. Questrade Allegedly Terminates the Agreement

After execution of the Agreement, Questrade used Financial's software and made the required payments for a number of years. However, in October 2015, Mr. Ladwa sent an email to Financial and attached a letter outlining Questrade's intent to terminate the parties' relationship. *See* Exh. M to Questrade's Mot. Summ. J. In the accompanying letter, Edward Kholodenko, Questrade's CEO, stated that "Questrade will continue with the Agreement until December 31, 2015 and that commencing on January 1, 2016, the parties to the agreement will have the option of renewing for additional renewal terms of thirty (30) days . . . ." *Id.*

In response, Matt Sullivan, in-house counsel at Financial, informed Mr. Ladwa that the Agreement "states that it may be amended only by a formal written agreement signed by both [Financial] and Questrade. [Financial] has not signed any written agreement that varies the payment of terms of the Agreement, so the original payment terms remain in effect." Exh. P to Questrade's Mot. Summ. J. Thereafter, Lawrence Horowitz, in-house counsel for Questrade,

5

provided Financial with a draft addendum to the Agreement that would have converted it to a month-to-month term. *Id.* In December 2015, Mr. Sullivan indicated that Financial would not be willing to amend the Agreement. *Id.*

The next communication Questrade sent to Financial was a January 13, 2016 email from Mr. Horowitz, which stated: "[i]n that case, please be advised that Questrade will be providing formal notice of termination, which will terminate the [Agreement] effective March 31, 2016. . . . Of course, Questrade is no longer obligated to pay any termination Fees to [Financial] for early termination, pursuant to Section [4(b)] of the Agreement." *Id.* It is undisputed that Questrade did not provide Financial with notice of termination by first class mail or express courier.

Two days later, Financial informed Questrade that the Agreement could not be terminated early without cause and insisted that Questrade would be responsible for all fees that accrued during the Agreement's term. *Id.* Questrade did not respond to this email.

In February 2016, Financial issued an invoice to Questrade in the amount of $93,180.47 for monthly hosting fees for April 2016 through June 2016. Exh. 16 to Financial's Mot. Summ. J. In April 2016, Financial issued an invoice to Questrade in the amount of $75,544.38 for monthly hosting fees for July 2016 through September 11, 2016, the end of the Agreement's original term. Exh. 17 to Financial's Mot. Summ. J. Thereafter, Financial asked Questrade about the status of payment for these invoices, stating "[c]an you please confirm the expected payment date of the attached two invoices? The one is now more than a month past due." Exh. 18 to Financial's Mot. Summ. J. Questrade responded "this is the first time we receive[d] these invoices," and that "[p]ayment will be made after we have processed them." Exh. 19 to Financial's Mot. Summ. J.

Financial followed up with Questrade several times throughout the summer of 2016 but Questrade never responded to Financial's emails or paid the invoices, which total $167,724.85. Consequently, Financial filed this lawsuit for breach of contract and unjust enrichment.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

The Court first addresses Financial's breach of contract claim, followed by the unjust enrichment claim.

### I. Breach of Contract

Questrade argues that it had a right to terminate the Agreement for convenience and it exercised that right in a sufficient manner. Financial, on the other hand, argues that Questrade did not actually terminate the Agreement, and as such, it must pay the invoices Financial issued. For the first time in this litigation, Financial also argues that even if Questrade did terminate the Agreement, it could not do so without paying an early termination fee pursuant to Section 4(b) of the Agreement as it should have been written but for a "scrivener's error."

#### A. *Whether Questrade Terminated the Agreement*

Although it is undisputed that Questrade did not provide Financial with a formal termination notice by express carrier pursuant to Section 17 of the Agreement, Questrade argues that Financial had actual notice of Questrade's intent to terminate the Agreement. Financial's actual notice, Questrade contends, stems from Mr. Horowitz's (Questrade's) January 13, 2016 email to Mr. Sullivan (Financial) following Questrade's failed attempt to re-negotiate the Agreement. In this email, Mr. Horowitz stated: "In that case, please be advised that Questrade

will be providing formal notice of early termination, which will terminate the [Agreement] effective March 31, 2016." Exh. P to Questrade's Mot. Summ. J.

Financial admits that, under New York law,[2] a party to a contract may dispense with strict compliance of a notice provision if the opposing party has actual notice or will not be prejudiced by the deviation. Questrade's Memo in Support of Mot. Summ. J. at 12 (citing *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 295 (N.Y. App. Div. 2006)). However, Financial argues that it did not have actual notice of Questrade's termination because Questrade acted inconsistently and provided only vague statements regarding its intent to provide formal notice at a future date. Therefore, the key question is whether Financial had actual notice of Questrade's decision to terminate the Agreement.

Questrade points to the deposition testimony of several Financial employees to support its argument that Financial had actual notice of Questrade's termination. For example, Kate Hegarty, Financial's corporate representative, admitted that Financial had actual notice of Questrade's intent to terminate the Agreement:

> Q: You agree that Financial received actual notice of Questrade's intent to terminate the Agreement?
>
> A: And my answer is yes.

Exh. Q to Questrade's Response to Financial's Mot. Summ. J. at 90:16–21 (objection omitted). Similarly, the Financial manager in charge of the Questrade account, Igor Gitsevich, testified that he believed that Questrade was trying to terminate the Agreement.

> Q: So at least as of January 14th, 2016, you can agree that setting aside . . . the legal sufficiency of [the January 13, 2016 email], you don't have a doubt in your mind that they are looking to terminate their agreement, right?

---

[2] Section 19(c) of the Agreement states that disputes are to be "governed by the laws of the State of New York." Both parties agree that this dispute is subject to New York law.

9

> A: It would seem so.
>
> Q: And that the agreement was going to terminate effective as of March 31st, 2016, right?
>
> A: Mmhmm.

Exh. G to Questrade's Response to Financial's Mot. Summ. J. at 45:22–46:6.

Questrade also points to several facts indicating that Financial had actual notice of Questrade's termination:

- In response to the January 13, 2016 email, Mr. Sullivan told Questrade that the Agreement does not allow Questrade to terminate early without cause. Exh. P to Questrade's Mot. Summ. J. Questrade argues that Mr. Sullivan would not have sent this email to Questrade if he did not interpret the January 13, 2016 email as a termination notice.[3]

- After the January 13, 2016 email, Mr. Gitsevich asked Mr. Ladwa whether it was "a done deal" or whether Mr. Ladwa wanted to talk about the termination. Mr. Ladwa responded: "Yes it is. I think you know why but if you need further clarity, we can chat on Monday." Exh. R to Questrade's Response to Financial's Mot. Summ. J.

- Post March 31, 2016, Questrade claims that it stopped using Financial's software. Exh. C to Questrade's Response to Financial's Mot. Summ. J. at 54:3–8.

In response, Financial argues that the emails and testimony highlighted by Questrade only show that Financial was aware that Questrade *had the intent* to terminate the Agreement, not that Financial had actually terminated the Agreement. For example, the January 13, 2016 email states only that Questrade "**will be providing formal** notice of early termination, which will terminate

---

[3] *See MCAP Robeson Apts. L.P. v. MuniMae TE Bond Subsidiary, LLC*, 26 N.Y.S.3d 52, 53 (N.Y. App. Div. 2016) (finding that the plaintiff's email to the defendant threatening litigation in response to the defendant's email notifying the plaintiff that the defendant was terminating the agreement demonstrated "that [the plaintiff] understood the email as notice of termination").

10

the [Agreement] . . . effective March 31, 2016." Exh. P to Questrade's Mot. Summ. J (emphasis added). And Financial employees answered affirmatively to questions from Questrade's counsel asking whether "Financial received actual notice of Questrade's **intent to terminate** the Agreement," Exh. Q to Questrade's Response to Financial's Mot. Summ. J. at 90:16–21 (emphasis added), and whether Financial was "**looking to** terminate their agreement," Exh. G to Questrade's Response to Financial's Mot. Summ. J. at 45:22–46:6 (emphasis added), not whether Questrade had *actually* terminated the Agreement.

Financial also argues that Questrade's conduct after the January 13, 2016 email is inconsistent with the notion that it had terminated the Agreement. For example, after Financial checked in with Questrade regarding the unpaid invoices in April 2016, Questrade did not dispute the invoices or state that it terminated the Agreement. Rather, personnel in Questrade's financial department told Financial that "[t]his is the first time that we receive[d] these invoices. Payment will be made after we have processed them." Exh. 19 to Financial's Mot. Summ. J.

When issues depend on what people meant at a certain point in time, it is essential for the factfinder to listen to and watch the testimony of the individuals whose actions, inactions, or intentions actually control the issue. Although both parties argue that the facts are undisputed in their favor, only one thing is clear to the Court: whether Financial effectively terminated the Agreement is a genuine disputed issue of fact. Therefore, the Court will deny both parties' motions for summary judgment on this issue.

### *B. Financial is Barred from Pursuing its Scrivener's Error Theory*

Financial next argues that even if Questrade did terminate the agreement, Questrade is required to pay an early termination fee pursuant to Section 4(b) of the Agreement because it allegedly should have been written to include an early termination fee even if Questrade terminated

11

the Agreement *after* 33 months. In turn, Questrade argues that Financial is not entitled to reformation of the contract because it did not ask the Court to reform the contract due to a scrivener's error in its complaint or raise this argument anywhere before its motion for summary judgment.

In support of its position, Questrade cites *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. Oct. 22, 2013). In *Enzo*, a breach of contract dispute between a patent holder and a licensed seller of the patent holder's products, the patent holder alleged that the licensed seller was selling third-party products in violation of their agreement. On summary judgment, however, the patent holder raised three new breach of contract claims, including that the licensed seller (1) failed to properly label the products; (2) failed to list the products in its catalog; and (3) breached its obligations to a third-party, of which the patent holder was a third-party beneficiary. The court concluded that it would not permit these new breach of contract claims. *Id.* It explained that "it is well settled that a party may not amend its pleadings in its briefing papers," and that "to the extent [the patent holder] omitted claims from the pleadings, it certainly cannot raise them in its summary judgment brief filed long after discovery has concluded . . . ." *Id.* (citing *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012)).

Similarly, in this case, Financial pleaded and initially argued only that Questrade did not terminate the Agreement and that Questrade breached the Agreement by failing to pay the invoices issued. *See* Complaint at ¶ 10–22. Financial did not include any allegations in its complaint that Questrade breached the Agreement by failing to pay Financial an early termination fee or that Section 4(b) of the Agreement contained a scrivener's error. *See id.* Nor did Financial ask the Court to reform the Agreement to correct any scrivener's error. *See id.* Rather, like in *Enzo*,

Financial raised these arguments for the first time—after the completion of discovery—in its motion for summary judgment.

As many courts in this Circuit and others have done before, the Court will preclude Financial's new theory of liability because Questrade spent significant time and tens of thousands of dollars on discovery based on the claims as pleaded by Financial, and allowing Financial to proceed with its eleventh hour theory of liability would require additional discovery and would impermissibly prejudice Questrade. *See e.g. Spence v. City of Philadelphia*, 147 Fed. App'x 289, 292 (precluding plaintiff from adding a new theory of liability at summary judgment because it "would have impermissibly prejudiced [the defendant]" and because "under this court's precedent, a claim that has not been timely raised is waived"); *Tourtellote v. Eli Lilly & Co.*, Civ. No. 09-0774, 2013 U.S. Dist. LEXIS 54389, at *19 (E.D. Pa. Apr. 16, 2013) (precluding plaintiff from adding a new theory of liability at the summary judgment stage); *Kaniuka v. Good Shepherd Home*, Civ. No. 05-2917, 2006 U.S. Dist. LEXIS 57403, at *35 (E.D. Pa. Aug. 15, 2006) ("Courts in this and other districts have held that they need not address claims that are raised for the first time in opposition to a motion for summary judgment."); *United States v. Union Corp.*, 277 F. Supp. 2d 478, 490 (E.D. Pa. 2003) (not addressing claims raised by plaintiff for the first-time during summary judgment); *Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("[C]ourts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."). Therefore, at trial, Financial will be limited to its original breach of contract theory.

## II. Unjust Enrichment

Financial also brings an unjust enrichment claim, arguing that even if the Court were to find that Questrade terminated the Agreement and could terminate the Agreement early without a

13

penalty, Questrade is liable to Financial because Questrade continued to have the ability to access and utilize Financial's software through September 11, 2016. In response, Questrade argues that Financial cannot maintain an unjust enrichment claim because Financial's service was the subject of the Agreement.

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted). Unjust enrichment claims are based on obligations "the law creates in the absence of *any agreement*," so "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery . . . for events arising out of the same subject matter." *Id.* at 586–87 (citations and quotations omitted) (emphasis in original). Nevertheless, courts have permitted plaintiffs to bring unjust enrichment claims for benefits provided by the plaintiff to the defendant following the termination of a contract. *See MyPlayCity, Inc. v. Conduit Ltd.*, Civ. No. 10-1615, 2012 U.S. Dist. LEXIS 100492, at *44–46 (S.D.N.Y. July 17, 2012) (allowing plaintiff to bring an unjust enrichment claim because it related "to revenues collected for the [defendant's]-branded toolbars [the plaintiff] distributed following the cessation of the parties' Agreement"); *Global Crossing Telecomms., Inc v. CCT Communs., Inc.*, Civ. No. 07-10210, 2011 Bankr. LEXIS 4609, at *9 (Bankr. S.D.N.Y. Nov. 10, 2011) ("[Plaintiff] alleges that it terminated the parties' contract but continued to deliver telecommunications services to [defendant] post-termination. If the terminated contract did not govern the parties' conduct, [plaintiff] would be entitled to seek recovery under the alternative theory of unjust enrichment."); *CosmoCom, Inc. v. Marconi Communs. Int'l, Ltd.*, 261 F. Supp. 2d 179, 187 (E.D.N.Y. 2003) (declining to dismiss unjust enrichment claim on summary judgment

14

because whether the defendant terminated the contract prior to the plaintiff's provision of benefits to the defendant was a disputed fact).

Here, Financial's unjust enrichment claim is predicated on Questrade's continued access to Financial's software after Questrade allegedly terminated the Agreement. As the Court discussed above, whether Questrade effectively terminated the Agreement is a disputed issue of fact. If, at trial, it becomes clear that Questrade did terminate the Agreement, Financial's unjust enrichment claim would not be foreclosed. Although it is undisputed that Questrade had continued access to Financial's software post-alleged termination, whether Questrade actually benefited from this access in any way and whether "equity and good conscience" require restitution remain in dispute. Therefore, the Court will deny the competing motions for summary judgment with respect to Financial's unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, the parties' competing motions for summary judgment are denied. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE